## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 20 2020, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

J.C. and G.P. (Minor Children),

and

A.P. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

October 20, 2020

Court of Appeals Case No.
20A-JT-901

Appeal from the Marion Superior Court Juvenile Division

The Honorable Mark A. Jones, Judge

The Honorable Ryan Gardner, Magistrate

Trial Court Cause Nos.
49D15-1908-JT-740 and 49D15-1908-JT-741

Child Advocates, Inc.,

*Appellee-Guardian ad Litem.*

**Altice, Judge.**

## Case Summary

[1] A.P. (Mother) appeals from the involuntary termination of her parental rights to two of her minor children. She challenges the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts & Procedural History

[3] Mother suffers from an opioid addiction, which has left her homeless and unemployed. She has not had custody of her four minor children since they were removed from her care in March 2018. This termination case involves her two youngest children, J.C. (born in April 2010) and G.P. (born in October 2015). Her older children are in the care and custody of their father.

[4] On March 9, 2018, the Indiana Department of Child Services (DCS) took all four children into emergency custody. In the CHINS petition filed a few days

later, DCS alleged, among other things, that: (1) Mother had failed to provide her children with a safe, stable, and appropriate living environment with necessary supervision; (2) she was using illegal drugs that seriously hindered her ability to care for the children; (3) she has a history of substance abuse and was previously found in the backyard of her home where she overdosed; (4) on or about March 9, 2018, the children were getting ready for school and found Mother overdosed on the bedroom floor; and, (5) Mother tested positive for cocaine and benzodiazepines following this recent incident. The children were all placed in the care of their maternal great grandmother.

[5] At a fact finding hearing on May 31, 2018, Mother admitted that the children were CHINS and that she "would benefit from services to obtain and maintain sobriety." *Exhibits* at 20. By agreement of the parties, the trial court entered a dispositional order that same day. The court ordered Mother to engage in home-based case management and therapy, complete a substance abuse assessment and follow all treatment recommendations, and submit to random drug screens.

[6] By the CHINS review hearing in September 2018, Mother had completed a substance abuse assessment in June and was scheduled to start outpatient treatment after the hearing. Mother was struggling with services but partially engaged. J.C. and G.P. remained in their maternal great grandmother's home, and the older children had been placed on a trial home visit with their father.

Mother was unsuccessfully discharged from her outpatient drug treatment program on December 1, 2018 due to sporadic attendance and positive drug screens. At that time, her addictions counselor recommended that she be referred for detox and residential treatment. Mother, however, did not believe she needed in-patient treatment for her addiction issues.

Between May and December 2018, Mother inconsistently engaged in services with her home-based caseworker, Regna Yates, and made no progress toward her goals. According to Yates, "[Mother] would be clean, and then she wouldn't be clean." *Transcript* at 108. Mother started going to a clinic to legally obtain suboxone, an opiate blocker, but then stopped due to lack of funds and insurance. Mother was unemployed and had no income. Yates delayed closing out services for some time in an attempt to "fight for [Mother] and encourage her to do what she needed to do," but she ultimately had to close services in December 2018 due to Mother's continued noncompliance. *Id*. at 110. Yates encouraged Mother to enter a detox program, but Mother refused.

Sydney Staten, the family case manager (FCM) since October 2018, experienced inconsistent contact, and often no contact, with Mother over the course of the CHINS case. Mother had a pattern of contacting FCM Staten to discuss or reinstate services, and then FCM Staten would not hear from Mother again and Mother would not engage with the referred service providers. This pattern resulted in FCM Staten having to re-refer services for Mother at least three times in 2019 (January, May, and December). The inability to keep service providers on the case also made holding child and family team meetings

nearly impossible. Over the course of the CHINS proceedings, Mother submitted to no drug screens for FCM Staten and successfully completed no services. Additionally, Mother attended none of the CHINS hearings in 2019.

[10] At the CHINS permanency hearing on July 11, 2019, the court changed the permanency plan to adoption for J.C. and G.P.[1] The court noted that the case had been open since March 2018 and that Mother was not participating in services and had not addressed her substance issues. Shortly thereafter, J.C. and G.P. were placed with their respective paternal grandmothers, where they have each remained. These are preadoptive placements.

[11] On August 26, 2019, DCS filed petitions for the involuntary termination of the parent-child relationship between Mother and J.C. and G.P., as well as between the children and their respective fathers. Mother had no engagement with services after the plan changed to adoption, and she did not exercise supervised visitation through a DCS provider after July 5, 2019.[2]

[12] Mother contacted FCM Staten at the end of 2019 and acknowledged that she was struggling with sobriety. FCM Staten looked into inpatient treatment for

---

[1] By this time, custody of the two older children had been granted to their father, and the CHINS case had been closed with respect to them.

[2] Alexis White provided Mother with homebased services and supervised visits starting on April 25, 2019. The services went well for about two months until Mother informed White on July 5, 2019, that she had a warrant out for her arrest for violating home detention. In fact, the warrant had been issued on May 14, 2019, and Mother was arrested on August 13, 2019. Mother never responded to White again, nor did Mother respond to a subsequent provider referred for supervised visits in November 2019. The criminal case, to which Mother pled guilty in February 2019, was for Level 6 felony obtaining a controlled substance (Percocet) by fraud or deceit. She completed her sentence on community corrections in October 2019.

Mother at VOA but there were no available beds. Mother informed FCM Staten that she now had insurance, so FCM Staten encouraged her to seek treatment on her own outside of this unavailable DCS provider.

[13] The factfinding hearing in the termination case was held on January 15 and February 19, 2020. Mother testified on both days. On the first day, she acknowledged that she had a history of daily drug use and that she had illegally used prescription drugs as recently as two weeks earlier. She also testified that she was not engaged with services through DCS, had no home of her own, and was unemployed. Mother claimed, however, that she was starting a job at KFC the next day and that she had just completed a detox program two days before the hearing. The inpatient detox treatment at Valle Vista, for which Mother provided no documentation, was from January 9 to January 13, and, according to Mother, she was scheduled to start therapy and obtain more suboxone on January 24. Mother claimed that this time was different and stated:

> I am tired. I am just ready to get my life together, get a job and get my kids, that is all I want is a second chance. I know this case has been going on for almost two years. I mean nobody is perfect. I have been going through a lot.

*Id*. at 68-69.

[14] On the second day of the hearing, Mother testified that she completed a substance abuse assessment with Journey Road on January 24 and attended an individual therapy session in February, though she could not recall that date or when her next appointment was scheduled. Mother provided no verification to

DCS or the court regarding these services or her claimed sobriety. Regarding employment, Mother indicated that she had quit her job with KFC in January after about a week and that she was scheduled to start orientation at the Finish Line warehouse the day after this hearing. Mother had no details regarding her hourly pay. Additionally, Mother indicated that she had moved again (now living with a family member) since the last hearing date.

[15] FCM Staten, several service providers, and the GAL also testified in this case. In addition to Mother's noncompliance with services, as set out in detail above, FCM Staten testified that there was no reason to believe that Mother's recent amenability to treatment would not end the same way as it has in the past. She noted that over the history of this case Mother has never been able to follow through in the long run. FCM Staten opined that termination of parental rights was in J.C. and G.P.'s best interests. The plan following termination was for J.C. and G.P. to be adopted by their respective paternal grandparents, with whom they had been living for about eight months and thriving.

[16] Similarly, the GAL, who had been on the case since March 2018, testified that in his opinion, termination was in the children's best interests. The GAL noted, specifically, Mother's inability to provide permanency for the children after nearly two years, her failure to engage in services, and her inability to maintain sobriety. The children were doing well in their respective preadoptive, relative placements, and the GAL and FCM Staten did not believe that giving Mother additional time would result in reunification with her. Additionally, J.C.'s home-based therapist, Elizabeth Saterlee, opined that permanency was

particularly important for J.C. and that J.C. would suffer additional trauma if she were to be taken from her current preadoptive home with her paternal grandmother.

[17] On March 20, 2020, the trial court entered its order terminating Mother's parental rights with respect to J.C. and G.P. The parental rights of the children's fathers had already been terminated, J.C.'s by default and G.P.'s by consent. Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[18] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[19] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States

Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[20] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

[21] On appeal, Mother initially challenges the trial court's conclusions with respect to I.C. § 31-35-2-4(b)(2)(B)(i) and (ii). We observe that I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and, thus, requires the trial court to find only one of the three requirements of the subsection by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209. Though the trial court found two of the requirements satisfied in this case, we will focus our review on the trial court's determination that there is a reasonable probability that the conditions that resulted in the children's removal and/or continued placement outside Mother's home will not be remedied.

[22] In making such a determination, the trial court is tasked with judging a parent's fitness to care for their child at the time of the termination hearing, taking into consideration evidence of changed circumstances. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013).

> Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." [*McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003)]. In addition,

"[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

*Id.* (some citations omitted).

[23]   Here, trial court made the following findings and conclusions in this regard:

f. The conditions that led to the Children's removal or placement and retention outside the home of Mother are her continued failure to demonstrate the ability and willingness to meet her parental responsibilities and provide for the Children's short-term and long-term needs due to failure to address her substance use, and her failure to show that she has stable, appropriate housing or employment.

g. These conditions have not been remedied.

h. It is highly probable that these conditions will not be remedied, even if Mother is given additional time to remedy the conditions. The Children's CHINS case has been open two years. Although Mother testified that she completed detox and that she started treatment at Journey Road, she did not begin detox or treatment until nearly two years after the CHINS matter began. Mother has not verified her involvement or progress in treatment. Mother has previously said that she intends to engage in services only to fail to follow through and become difficult to reach. Mother has not signed releases so that DCS can obtain information regarding her treatment and progress.

i. Mother lives in a two-bedroom home with a family member, and had not started her employment with Finish Line at the time

of the TPR trial. She is unaware of what her hourly rate would be.

j. Mother has maintained contact with the Children, but has not demonstrated an ability to parent them throughout the pendency of the CHINS case. The Children have been in relative care for the entirety of the CHINS matter, and have never been returned to Mother's care. Mother has also never progressed to unsupervised parenting time.

k. Mother demonstrated a lack of commitment to remedy the conditions and she is responsible for her failure to engage with the service providers. Mother failed to successfully complete services despite FCM making several referrals for court-ordered services.

l. There is a substantial probability that future neglect or deprivation will occur because of Mother's failure to remedy the conditions.

m. The Court finds that DCS has shown by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home of Mother will not be remedied….

*Appendix* at 28-29.

[24] The evidence overwhelmingly shows that at the time of the final hearing Mother was not in any position to care for her children. She did not have adequate housing or stable employment and, at most, had been sober for less than two months. Further, she engaged in the recent treatment only on the eve of trial and provided no documentation or drug screens to show her progress.

Under the circumstances, the trial court acted within its discretion in weighing more heavily Mother's pattern of conduct during the almost two years leading up to the termination hearing. Contrary to her assertions on appeal, it is not evident that Mother had finally "turned a crucial corner" after four days of in-patient treatment and a couple therapy sessions. *Appellant's Brief* at 19. Mother had claimed to be clean and had sought services in the past, only to disengage shortly thereafter and return to using drugs. While we hope, for her own sake, that Mother is now adequately addressing her substance abuse issues, which have clearly devastated her life, we cannot say that the trial court's conclusion that she will not remedy these conditions is clearly erroneous.

[25] Finally, Mother challenges the trial court's determination that termination of parental rights is in the children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride*, 798 N.E.2d at 199. Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

termination is in the child's best interests." *In re. J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[26] The trial court made the following findings in support of its best-interests determination:

> e. Permanency is in the Children's best interests.
>
> f. Mother has not demonstrated the ability or willingness to parent the Children, to provide the Children with a permanent, safe and stable home environment free from substance abuse, or to provide for the Children's long-term and short-term needs.
>
> g. The Children have been in relative care for the entirety of the CHINS matter, and they have both been placed with their paternal grandmothers for more than eight months. The Children have support and stability, and they are thriving in their respective relative care placements.
>
> h. Mother was unsuccessfully discharged from her court-ordered services on several occasions despite multiple referrals and opportunities. Several providers also ignored their respective agency policies requiring discharge in order to attempt to assist Mother with meeting her goals. Mother did not begin services on her own until nearly two years after the inception of the CHINS matter, and approximately five months after the TPR petition was filed.
>
> i. Both the FCM and the GAL believe that termination of the parent-child relationship between Mother and the Children, and the adoption of the Children by their relative caregivers, is in the Children's best interest.

*Appendix* at 30-31.

[27] Mother correctly observes that her constitutional right to raise her children may not be terminated solely because there is a better home available for them and that termination should be a last resort, available only when all other reasonable efforts have failed. *See In re V.A.*, 51 N.E.3d 1140, 1151-52 (Ind. 2016). In this case, DCS referred and re-referred services for Mother time and again, and Mother regularly rebuffed service providers, who bent rules in order to try to help her. She barely ever engaged in services, and she made no progress for nearly two years. In other words, the record establishes that all reasonable efforts had failed and termination was in the best interests of the children.

[28] Judgment affirmed.

Riley, J. and May, J., concur.